GOVERNMENT OF THE VIRGIN ISLANDS, PETER J.
O'DEA, Attorney General and IRA E. TRANT,
Plaintiffs

v.

PUERTO RICAN CARS, INC., a/k/a HERTZ RENT–A–CAR,
Defendant

Civil No. 52-1970

NEVILLE LA BORDE, Plaintiff

v.

HERTZ INTERNATIONAL LTD., a/k/a PUERTO RICAN CARS,
INC., a/k/a HERTZ RENT–A–CAR and
SHARON CUSHIERI, Defendants

Civil No. 299-1969

HILDA L. BUTLER, Plaintiff

v.

HERTZ INTERNATIONAL LTD., a/k/a
PUERTO RICAN CARS, INC., a/k/a
HERTZ RENT–A–CAR and SHARON CUSHIERI,
Defendants

Civil No. 298-1969

District Court of the Virgin Islands

Div. of St. Thomas and St. John

June 29, 1973

CORNEIRO, GIBBS & SELKE, ESQS. (FRANCICO CORNEIRO, of counsel), Charlotte Amalie, St. Thomas, V.I., *for plaintiffs La Borde and Butler*

ATTORNEY GENERAL of Virgin Islands *for Virgin Islands Government*

THOMAS D. IRELAND, ESQ., St. Thomas, V.I., *for defendants*

CHRISTIAN, *Chief Judge*

## MEMORANDUM

The court is here concerned with three civil actions substantially similar in nature. They are styled THE GOVERNMENT OF THE VIRGIN ISLANDS OF THE UNITED STATES OF AMERICA, PETER J. O'DEA, Attorney General and IRA E. TRANT v. PUERTO RICAN CARS, INC., a/k/a HERTZ RENT–A–CAR, docketed at No. 52/1970; NEVILLE LA BORDE v. HERTZ INTERNATIONAL LTD., a/k/a PUERTO RICAN CARS, INC., a/k/a HERTZ RENT–A–CAR and SHARON CUSHIERI, docketed at 299/1969; HILDA L. BUTLER v. HERTZ INTERNATIONAL LTD., a/k/a PUERTO RICAN CARS, INC., a/k/a HERTZ RENT–A–CAR and SHARON

CUSHIERI, docketed at No. 298/1969. (The defendants will be hereinafter referred to as Hertz and PRC.)

The Butler and La Borde cases were consolidated for trial. Trial was had and at the conclusion thereof, it was agreed that the parties would reduce their closing arguments to writing, but would not be called upon to file the same until 30 days after receipt of the transcript. After the transcript had been prepared and before the written arguments were filed, the plaintiffs in No. 52/1970 requested leave to have their case considered jointly with the other two, relying on the transcript of the earlier combined trial as the evidence in their case. That motion was granted.

The basic and common thrust of these actions is that the defendant on specified occasions discriminated against black residents of the Virgin Islands in the conduct of its business, i.e., the renting of automobiles.

Subsequent to the commencement of suit, one Jean Tipograph, an employee of the defendant, PRC, was joined as a defendant in the cases docketed at 298/1969 and 299/1969. In the course of the trial, however, the court granted a motion to dismiss the complaint as to both individual defendants.

It should be noted also that at the conclusion of the trial, the court granted a motion by plaintiff, Butler, to amend paragraphs 8 and 9 of her complaint to allege that it was the refusal of the defendants to honor her reservation rather than the refusal to rent an automobile that constituted the discriminatory conduct against her.

Other motions were made during the course of the trial, one a motion to dismiss as to defendant Hertz is still pending and will be disposed of below. Motions to dismiss generally by the defendants in each of the two cases were made and denied.

The accusations against the defendant adhere to two set forms. It is first alleged that the defendant discriminated against the individuals Butler, La Borde and Trant by refusing to rent them cars, or in the case of Butler, to honor her reservation to rent a car, on the sole basis that they are black, native Virgin Islanders. The second assertion is that in the renting of cars to black natives, the defendant applied standards which were either not applied to white renters or were applied in a maleficently different manner. The details of these accusations will appear as I discuss and outline my findings. As orderliness and clarity would be served by my so doing, the incident involving each individual plaintiff will be discussed separately. The incidents of alleged discrimination involving witnesses who testified but were not parties will also be dealt with insofar as such testimony bears on the alleged discriminatory acts and conduct.

Plaintiffs La Borde and Butler seek only the statutory relief provided for individuals offended by discriminatory conduct proscribed by the statute, i.e., punitive damages in the amount of $5,000 each. The Government of the Virgin Islands and Trant, however, in their prayer for relief, cover the entire gamut of penalties. They seek an injunction against the defendant, enjoining the maintaining of a policy of discrimination against prospective black renters and from maintaining or continuing "a custom, policy, practice, acts or uses of discrimination against blacks". Over and above injunctive relief, the Government and Trant seek a declaratory judgment that the acts, policies, practices, customs and usage of PRC, be declared in violation of the Thirteenth Amendment to the United States Constitution, as well as several cited federal statutes and Title 10 of the Virgin Islands Code §§ 3–7. Additionally, the Government would have the court revoke or suspend the defendant's license to do business pursuant to the pro-

vision of Title 10, V.I.C. § 8. Finally, the Government asks that the defendant be ordered, for the next two years, to distinctly and plainly state in all advertisements, and by a sign to be prominently displayed to the public in all places from which it conducts business, reading "NO RACIAL DISCRIMINATION". As to Trant, the statutory monetary damage in the amount of $5,000 is also prayed.

█ Before delving into these cases, I must initially deal with two preliminary matters. First, the pending motion of defendant HERTZ INTERNATIONAL LTD., named as a defendant in the Butler and La Borde cases, to dismiss as to it should be granted. The employees involved were shown to be in the employ of PUERTO RICAN CARS only. The evidence disclosed no privity between them and Hertz. Whatever managerial and technical advice Hertz may have given Puerto Rican Cars, it does not suffice to bring Hertz within the word "owner" as that word is used in the statute upon which the court's decision in this case will be grounded. We deal, therefore, only with the liability of PRC.

█ The second matter to which I direct attention concerns the statutes on which the Government and Trant rely. Not only do they seek relief based on a claimed violation of the Virgin Islands Civil Rights Act, but they also supplicate redress under the Thirteenth Amendment and various federal civil rights laws. I find it unnecessary to discuss or decide the federal questions and restrict my determination in this case solely to the violations of Title 10 of the Virgin Islands Code. The specific acts of misconduct charged seem more appropriately treated in relation to the Virgin Islands law and insofar as the plaintiffs who would evoke federal power and authority are concerned, I see nothing to be gained by pursuing those claims, this despite the fact that there may be ample support for

the conclusion that those enactments also were violated by the action of the defendant through its employees. See Jones v. Alfred H. Mayer, Co., 392 U.S. 409 (1968).

### Neville La Borde

On December 6, 1968, at about 10 o'clock a.m., Neville La Borde, a black, native Virgin Islander, telephoned Hertz to make arrangements for the rental of one of their vehicles. He spoke with a female employee who assured him that there would be a car available for him upon arrival at the Harry S Truman Airport, from which location cars were rented. Some two hours later, La Borde presented himself at the Hertz counter at the airport to pick up the promised car. After waiting at the counter for about 5 to 10 minutes, during which period he was completely ignored by the employees present, La Borde identified himself to a lady standing behind the counter and advised her that he had come to pick up the car concerning which he had called. The attendant riffled through a file and then told La Borde that she had no reservation for him. La Borde explained that he had shortly before spoken to her on the telephone and had been assured that a car would be available for him upon his arrival, but she denied having received any such call. The rental agent went on to say that had there been any such call, she only could have been the one to have taken it, and she recalled none. La Borde, totally frustrated, thanked her and left. He testified that there were, at that very time, several white persons at the counter seeking to rent cars and that none of them was turned away carless.

Defendant suggests several possible explanations of this alleged discriminatory conduct. First, they assert that La Borde never called to make a reservation but rather had shown up out of the blue hoping to obtain a car. Next, they surmised that he really wanted to create an incident

15

against them and never in truth wanted a car at all. Finally, defendant would excuse the incident with the explanation that if, in fact, La Borde called, the PRC employee who took his reservation inadvertently neglected to record and file the same, a not infrequent occurrence, they say.

La Borde identified one Jean Tipograph as the person to whom he spoke upon arrival at the airport on the morning of December 5, 1968. All indications are that she was the person with whom he had made contact by telephone prior to his appearance at the Hertz airport counter. Jean Tipograph did not dispute La Borde's version of what transpired, rather she limited her response to a lack of recollection of the call. She did not deny that had the call been made and received, as La Borde testified, she would have been the only female with whom he could have spoken.

### Hilda L. Butler

La Borde, upon leaving the PRC counter, went to the home of a cousin, Hilda L. Butler, and asked her to call Hertz to see if she would be able to rent a car for him. She agreed to do so and did, in fact, place the call. The male who answered turned her call over to a female attendant. The latter inquired of Butler (a native but who speaks with a "mainland accent") from what location she was calling. Although Butler had placed the call from her home, she replied that she was calling from the Caravan Hotel. Upon being asked the length of the period for which she desired a car, Butler indicated that her need was for two days. Thereupon, the rental representative offered to send one of their cars to pick Butler up at the hotel. This offer was declined by Butler who told the rental representative that transportation to the airport rental office was already available to her. Butler advised that she would be there within 30 minutes.

16

Butler, together with her uncle and La Borde, arrived at the airport about 45 minutes later. La Borde, it seems, remained outside and did not go to the Hertz counter. Two rental representatives were behind the counter when Butler presented herself, a male and a female attendant. Both appeared to Butler to be busy. After a time, the woman approached Butler and offered to assist her. Butler gave the lady her name and advised her she was there for the car which she had reserved shortly before. The lady replied that she recalled no reservation having been made in the name of Butler but that she would check to verify her recollection. After going through what appeared to be files, the attendant returned to the counter and told Butler she was sorry but that there was no reservation for her. Butler then insisted that there had to be a reservation because she had made a request for a car by telephone and had received an affirmative response. An argument then ensued between Butler and the female representative which ended with Butler leaving the Hertz rental area without a car.

From the testimony it developed that it had been Mr. Abad, PRC's assistant manager, who had taken the Butler call. He, being otherwise occupied, had turned the call over to Jean Tipograph who admitted that she had promised Butler that there would be a car, a volkswagen, available for her upon her arrival. The telephone on which the call had been received and which is in an inner office, carries a different number from the telephone at the outside counter. There was no mechanical means of transferring a call from one number to the other. Abad testified that ordinarily, if he received a call for a reservation on the phone in the inner office, he would ask the caller to hang up and call the counter. On this occasion, however, he had asked Tipograph, then in his office, to handle the Butler call. This was verified by Tipograph. She conceded that

she had "okayed" the reservation since there had been a cancellation that day. However, she was counting money and preparing a bank deposit. She went on to say that after preparing the deposit she forgot to record the reservation and neglected to convey the information to Sharon Cushieri (the lady with whom Butler had the confrontation). Tipograph further stated that having made up her deposit, she left the office, deposited the money at the bank, and thereafter went to lunch. It is of relevance to note that Jean Tipograph testified that she had assumed that Butler was a tourist.

According to Cushieri, on the day in question, the only cars available were those on which there was a confirmed reservation. She stated too that she knew of no cancellation on that day. How Tipograph had learned of a cancellation was not explained. Also not explained was how it happened that Cushieri, a rental representative, had not been made aware of the cancellation to which Tipograph referred, the better to serve her customers. Defendant contends that Butler was never refused a car but was merely told that no reservation could be found in her name. They go on to argue that since she had not then asked if a car was available, it cannot be said that she was denied a car. That contention I could hardly be expected to accept for the evidence satisfies me that in the circumstances, Butler's request for a car would have been but a futile verbal exercise. PRC was in the business of selling a service, and that to "all comers". The very nature of that service demands a certain degree of solicitousness toward the public by those whose job it is to meet the public in the offering of the service. Management must certainly have trained its representatives to cope courteously with even irate customers claiming reservations which could not be located. Granted, Butler with the recent experience of her cousin La Borde in mind, was bound to be testy. On the

other hand, this could not possibly have been the first instance of a confrontation with an angry customer whose reservation could not be located. Cushieri's alacritous entry into battle, if indeed she did not precipitate the conflict, once again comports the pattern of hostility to black customers on the part of these rental representatives of the defendant company which pervades the trial testimony. It was to be expected of agent Cushieri that she would make some effort to offer the customer a car and not make this expected courtesy depend upon whether or not the employee considered the customer to be "nice". No car was offered Butler despite Cushieri's testimony (Tr. 384–385) that "[P]ossibly something could have been worked out, because reservations in the past have gotten lost and if people are positive that they do have a reservation, then everything is done to see that we can get them a car". (One wonders what could have been worked out, if as Cushieri earlier testified, the only cars on hand that day were those on which there were confirmed reservations.) Beyond question, Butler was positive about her reservation. Equally certain is the fact that nothing was done to accommodate her. This conduct falls far short of defendant's claimed rental policy of a car to all on an equal basis.

### Ira E. Trant

On December 31, 1968, Ira E. Trant went to the counter of the Avis car rental agency at the Harry S Truman Airport hoping to rent a car. Trant, who is black, and an unidentified white gentleman, repaired at the Avis counter at the same moment and both were informed that Avis had no more rental cars available. The Avis attendant sent both men to the adjacent PRC counter to see if they might have better luck there. The PRC attendant waited on the white customer first and without any ado, a vehicle was rented to him. Trant thereupon asked for a car to which

19

request the agent replied, "well, you do not have any reservation. Fill out this form and call us in about two hours". The white customer, when asked, had admitted that he had no reservation, however, he had not been asked to fill out a form of any kind. Trant executed the form, gave it to the agent, and left. He returned to town and upon arriving there, ran into his brother, a police officer, and an unidentified friend who at the time was in the employ of PRC. According to Trant, the friend advised him to look on the back of the door inside the PRC counter for the slots in which reservation cards were kept, to get an idea of the number of pending reservations. Trant returned to the PRC counter at the airport, this time accompanied by his brother. He observed the reservation slots and testified that he saw four or five reservations. He testified that he thereafter checked the parking lot and saw nine or ten cars which he believed were owned by defendants. Trant then again approached the Hertz counter and asked for a car. Upon the attendant's refusal to rent him a car, he accused the rental representative of overlooking him, and advised that he was hurt by this action on the representative's part. He then walked away from the counter.

None of the defendant's employees appear to have had any recollection of the Trant incident. Three possible explanations were offered by defendant in justification of why the car was rented to the white customer while at the same time renting none to Trant. Defendant suggests that the white person must have arrived at the counter first and must have received the last available car. Secondly, defendant contends it was possible that the white man did, in fact, have a reservation with PRC. Thirdly, defendant asserts that Trant was in no position to make a decision about the availability of cars merely by looking in the park-

ing lot for he could not distinguish between Hertz and Avis cars.

Defendant's first proffered excuse that the unidentified white patron received the last available car, having arrived at the counter before Trant did, must be examined in the light of all the surrounding circumstances. Trant testified that neither he nor the white customer had reservations when they went to the counter. The fact that both men had just sought to rent cars from Avis and had appeared at the PRC counter at the suggestion of the Avis attendant, bears this out. I find therefore that neither Trant nor the other gentleman with him when he appeared at the PRC counter had a reservation with that company; that when Trant asked for a rental car he was told that he did not have a reservation and as a consequence was required to fill out a form and call back in about two hours, a procedure that was not followed in the case of the white customer who, without a reservation, asked for and was given a car at the very same time Trant was seeking one. I note with interest that Trant was not told that no cars were available, he simply was not given one.

On direct examination, Trant testified that he and the white gentleman could not obtain cars at Avis because that agency claimed that they had no more cars to rent. When asked on cross examination if he had been told by Avis that all their cars were out, he explained "that is right". In view of this, I find it reasonable to infer, from the total testimony, that Avis had no cars in the airport parking lot at the time. Since Trant said that immediately after having been denied a car he saw about nine or ten in the parking lot, and inasmuch as I have inferred from the testimony that they were not cars of the Avis agency in the lot, I find that the cars which Trant saw, in all likelihood, belonged to PRC. Further, as defendant in no way rebutted Trant's testimony that there were no

more than four or five reservation cards in the slot, the reasonable inference is that there were more cars available than there were cars committed by reservations.

Upon consideration of all the testimony, I find that La Borde made the call on December 5, 1968, and did, in fact, reserve a car; that when he appeared at the airport for the car, he was told that there was no record of his ever having called to make the reservation; that no offer of a car was made as would be expected in the circumstances and hence he was effectively denied a car; that at the same time, cars were being rented to other customers, all white, without untoward incident, though it is not known if those persons held reservations. I find further that La Borde's telephone conversation was with Jean Tipograph and that she was the person to whom he identified himself at the airport in his efforts to obtain the car for which he held a confirmed reservation; that La Borde was the only black person then at the counter seeking to rent a car. I find too that the claimed lack of recall by Tipograph as to certain key statements by La Borde was feigned, in view of her apparently vivid recollection of so many far less pertinent details. The weight of the evidence preponderates heavily in favor of La Borde's assertion that the defendant's refusal to rent him a car was due solely to the fact that he was black and obviously native, and I so find.

In the light of Butler's announcement, upon her arrival, that she had come to pick up the reserved car, with no attempt on Cushieri's part in her response to sooth the troubled waters, if in fact the reservation could not be found, the failure to offer to make the arrangements which Cushieri admits were possible, all considered in the context of the other evidence in this case, prompts me to find that, as in the case of La Borde, Butler was denied the rental of a car for no other ostensible reason but her race and color.

22

As to plaintiff Trant, I find the discrimination against him to have been as obscene as it was obvious, and motivated purely by his status as a black native.

The incidents about which La Borde, Butler and Trant testified occurred within a 30-day period in the month of December, 1968. Considering the testimony of these three persons and the testimony offered in opposition by the defendants, I resolve the said testimony in favor of the plaintiffs and view as fully sustained, my finding, that all three were refused the rental of cars solely on the basis of the color of their skin. I go on to comment on evidence of witnesses other than the three principals which provides ample support for my basic finding.

Ersila Slavin (Slavin) was employed by defendant PRC as a rental representative for the nine-month period ending in July of 1967, at the Virgin Islands Hilton Hotel and the Harry S Truman Airport. Slavin, on the stand, told of a memorandum posted by the then manager of PRC, Rick Ramondo, instructing the rental representatives to ask for a one hundred dollar deposit from any native person seeking to rent a car. When asked what was meant by native person, Slavin replied that she understood it to mean black natives, because cars were rented to white natives all the time, without the one hundred dollar deposit. Slavin further testified that this policy was implemented by listening for any discernable indication that a telephone caller, desiring a car, was a St. Thomian or native Virgin Islander. The caller, once the rental representative concluded he was a black native, would be told that no car was available. Should such a prospect personally come down to the airport to rent a car, Slavin testified he would be asked to fill out a white card, have his employer sign it, and then return it to the defendant. At such time as the card would be returned to Hertz, the person would then be told that no cars were available. Black natives only were required

to go through this procedure, Slavin said. Slavin also testified that while she did receive literature from Hertz, instructing that rental representatives were not to discriminate against blacks, the actual instructions she received from Ramondo, her superior, were in direct contravention of such orders of Hertz.

Defendant assails Slavin as a biased and untruthful witness. They count it highly incredulous that a company bent on discriminating against blacks would choose to do so through a black employee. PRC's protest, if sincere, fails to take history into account, for from time immemorial, no better scheme for subjugating peoples or groups has ever been contrived. Carefully select one member of the group, flatter that one sufficiently and with that one sufficiently indoctrinated, work the subjection of the rest. Here the strategy used was more readily apparent than in most cases. Defendant played on the antagonism, suspicion and biases of native Virgin Islanders against aliens and vice versa, using the alien employee as the tool by which to wreak discrimination against the black native. Moreover, what more pliant cat's-paw than an alien, insecure of status, his stay in the Virgin Islands, more than likely depending on the signature of his employer. And, if a retreat were needed, defendant could fall back on the safe haven of equal opportunity employer, pointing to the few black aliens in his employ.

The other attack by defendant on Slavin's credibility that she is embittered against them because she was forced to terminate her position with them when she married another of their employees, does not hold water. Certainly this would be ground for bad feelings on Slavin's part. I give this supposed reason scant credit, however, as Slavin's testimony about the white card routine dovetails too closely with the treatment Trant said he received at defendant's hands. Her testimony blends too with the com-

plaints of all who had unpleasant and embarrassing experiences with PRC, not to mention the support it draws from the letter of November 22, 1966, to PRC from its landlord at the airport. The corroboration which her testimony received renders her testimony sufficiently invulnerable to withstand defendant's attack despite some inconsistencies in her testimony to which defendant could point.

As further basis for their allegations of racial discrimination practiced by the defendant, plaintiffs cited a memorandum issued by a one-time manager of PRC, Charles VanLoon. This memo directed to the entire rental staff on September 19, 1966, instructed the PRC rental staff as follows:

I want to severely restrict rentals to local people as these have proved to be a greater risk than any other type of renter. Under no circumstances should reservations from local people we do not know be confirmed. All such reservations either by phone or at the counter are subject to the "availability of cars". This will give you an opportunity to closely investigate whether these people qualify for Hertz service. Please refer to your *Counter Facts* for full details regarding qualifying customers. A great number of our accidents, bad debts, etc., are caused by local renters. I therefore request your full cooperation so that these type of rentals can be eliminated.

A Louis Angelone who replaced VanLoon in October of 1966, continued the policy articulated by his predecessor until May, 1967. Angelone testified that after he became aware of the VanLoon memorandum, he confiscated such copies as he could find and called a staff meeting, at which he explained that the VanLoon memorandum "could be misinterpreted" because "it was poorly written. . . ." Angelone testified,

Well, the policy I explained at that meeting it's the same, whether it's local people or outsiders, it doesn't matter, tourist or anybody. It's a question of financial responsibility basically and the

ability to comply with the local laws and federal laws of the area they are in.

Defendant claims that this explanation expressly outlines in very firm terms, their absolute policy of nondiscrimination. Be that as it may, the fact remains that a manager of defendant had instituted the offending policy and had exhorted his staff to rigidly apply it. Moreover, the determination of Angelone's "question of financial responsibility" kept the door wide open to accomplish the same purpose under a more righteous banner. The opportunity for this became readily evident in the course of the testimony.

That Angelone's approach did not really repudiate, or even abandon the VanLoon established policy is seen in two instances. First, in his response to a letter from the Executive Director of the Virgin Islands Airport and Industrial Resources Agency, highly critical of defendant's discrimination rental policy. In his letter to the Executive Director, Angelone declared, "local customers any place, as a group, are generally not as desirable as customers from out of town when viewed from the standpoint of financial responsibility." In the second place, responding to questions put to him by the court, Angelone admitted that once they determined (by means never really made clear) that a native was financially irresponsible, the person was never advised that his lack of funds rendered him ineligible to rent a car, thus giving that native a chance to demonstrate his ability, if he so chose. Rather, the native, whose "financial irresponsibility" was determined, was, Angelone conceded given "diplomatic" treatment, i.e. told that no cars were available.

With the above as background, and in the light of the several complaints, one in the nature of what was tantamount to a reprimand from Alton Adams, Jr., Executive Director of the Virgin Islands Airport and Industrial Re-

sources Agency, whose impartiality must, at the very least be assumed, if not conceded, I find that the persons in the employ of PRC, at the time of the occurrence with which we are here concerned, knew of, and were influenced by the VanLoon memorandum (Angelone's testimony to the contrary notwithstanding) as well as the Angelone restatement of the basic policy established by VanLoon. I deduce from Angelone's testimony that during his tenure the discrimination against natives continued but on a somewhat more subtle plane. Angelone formulated the theory that a tourist, merely by virtue of that status, was a desirable customer whereas the local resident, ipso facto, was not. Great burdens were placed in the way of rentals by natives, whereas nothing except perhaps identification was required of tourists. Though Angelone insisted that the factors on which he relied in making his determination that the tourist was a responsible person were objective ones, such as reservations at a hotel, a credit card, luggage, and the fact that the tourist had made the financial arrangements to come to St. Thomas from his place of residence, whereas, in his view, the local prospective renter may not have had a dime in his pocket, such considerations inevitably led to discrimination against the black natives. One's status as a tourist cannot reasonably be accepted as a rational measure of a person's financial worth. It is no less irrational to conclude that a person is financially irresponsible merely because he is a local native, and since tourists in this context can reasonably be said to be synonymous with white and local native with black, it gives one the greatest difficulty once the discrimination has been established, to draw the fine line between asserting a preference in favor of the financially sound tourist and discrimination against the assumed irresponsible local because he is black. I cannot but find that a policy which strictly requires that one class of persons be closely scrutinized

while another be examined only cursorily, if at all, is one that invidiously discriminates. As arbitrarily as the policy was imposed, it ineluctably led to discrimination.

Angelone, as we have seen, left the company in May, 1967, and was followed in office by the Rick Ramondo about whom Slavin testified. He carried the arbitrary differentiation between the local and the tourist one step further by requiring natives to put up $100 deposit if they wished to rent a car, at least so Slavin testified. In this, Slavin was borne out by another former PRC employee, Allen George who was with the company until December, 1968. He, like Slavin, was aware of the directive requiring the posting of the $100 by natives but George did not specifically say that the requirement was Ramondo's doing. For a period, both George and Slavin worked for the company at the same time. This circumstance gives credence to their testimony that the $100 requirement was in effect. Since there is no testimony to the contrary, and having in mind Slavin's testimony that Ramondo's effort was the same as Angelone's, i.e., to discourage, if not eliminate, rentals to locals, I find it reasonable to infer that such a policy persisted up to the time these plaintiffs sought to rent cars, and that it was this policy which resulted in the discrimination against the plaintiffs, i.e., the refusal of the company to rent them automobiles on the ground that they were natives, which is to say black, on the same basis on which cars were rented to tourists (white).

In further support of the finding that the defendant discriminated against native customers, we will once again look at the testimony of Allen George. Defendant denies that a $100 deposit was ever asked. George in corroborating Slavin as to the amount of the deposit, testified that it was not to be asked only of black persons but of whites as well if they did not have a credit card. Assuming for the moment that the $100 deposit was asked on an even

28

handed basis despite defendant's avowal that it was not asked of anyone, George went on to explain that whenever a rental representative rented a car to a black person, that rental representative undertook personal responsibility to defendant for any risk or loss that it might suffer by reason of the rental. George in his testimony stated,

Yes, if I take it on myself to rent a local black a car, I was responsible for renting him a car, but the continentals [white tourists from the United States] or the white natives who rent a car, it was either established who they were or had a business of some sort. They [PRC] did not require me to have them [whites] put up the same requirements that the blacks would have to put up (Tr. 140).

George explained that on occasions he personally vouched for native applicants whom he knew. Clearly to be inferred is that this obtained without regard to ability to pay. George did not testify that he had ever been called upon to make good on any of his guarantees. Yet, the persons for whom he vouched would not have been rented cars but for his guarantee, and this on the sole basis that they were black "poor risk" natives.

The experience recounted by one Joyce LaMotta, called as a witness by the plaintiffs, is as at once interesting and pertinent. Mrs. LaMotta is black, and if not truly native, is possessed of enough credentials in that direction to make it not unreasonable to so consider her. Like plaintiff, Hilda Butler, her speech, unless she deliberately feigns native twang, is indistinguishable from the accent of the so-called continental (white tourist). One day in December of 1968, LaMotta, whose car was being repaired and could not be delivered to her until the next day, called PRC explaining her dilemma and inquiring if a car was available for rent for that day. Not only was she advised by the rental representative that a car was on hand and would be placed at her disposal, but was told that someone would

29

come and pick her up and bring her to the airport. Upon her arrival at the airport (it is not clear by what transport) Mrs. LaMotta testified she stood at the counter for some considerable time completely ignored. After a while she identified herself to the attendant (Jean Tipograph) and explained the purpose of her presence. She claimed that a rental form was then rudely thrown on the counter and that she was advised that she would have to put down a deposit of $100. The concurrence of this requirement and the rude manner in which the form was handed to her, she says, caused a heated argument to ensue between her and Tipograph. In the course of this heated exchange, LaMotta said she made clear to Tipograph that she was not about to leave a deposit of $100 for a one day car rental. When asked by Tipograph if she had a credit card, she admitted that she did but declined to make a $15 charge on her American Express card. The positions taken by LaMotta served only to cast oil on troubled waters, and as the now thoroughly hot exchange was heading to a more acrimonious level, LaMotta testified she left the Hertz counter, went next door to Avis, and without any folderol, promptly obtained a car.

Many contentions are raised by defendant in its endeavor to escape liability. Not all of them need be met for some seem to have been tossed in as make weight. To those contentions of more substance, I address myself briefly. Before doing so, however, the pertinent portions of the Virgin Islands Statute should be set out.

The broad area of civil rights is covered in Title 10 of the Virgin Islands Code. The subject is introduced in Section 1 by a strong statement of public policy. The following excerpts set the entire tone for the assault on discriminatory conduct in all of its forms:

It is declared to be the public policy of the Virgin Islands that all natural persons within its jurisdiction shall be entitled to the

full and equal accommodations, advantages, facilities, and privileges of any place of public accommodations, resort, or amusement, and to the equal opportunity and treatment in employment in any and all businesses and industrial establishments, and to membership in all labor organizations, and to equal privileges in the purchase, lease or rental of real estate, and in the purchase of any commodity or service offered for sale; subject only to conditions or limitations imposed by law and applicable in like manner to all persons.

In order to implement this public policy, it is the intent of this chapter to prevent and prohibit discrimination in any form based upon race, creed, color, or national origin, whether practiced directly or indirectly, or by subterfuge in any and all places of public accommodations, resort, or amusement, and in all sales of real estate, goods, articles, accommodations, commodities, or services, and in the employment of persons, or their working conditions, or obtaining union membership, and to prohibit clubs from establishing a private clientele of either member or guests, which they have selected, and with which persons alone will they transact their business and commerce.

The rights of persons and prohibition against discrimination are stated in section 3.

(a) All natural persons within the jurisdiction of the Virgin Islands, without regard to race, creed, color, or national origin, and subject only to the conditions and limitations established by law and applicable in like manner to all persons, are entitled to—

\* \* \*

(2) the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, resort, or amusement.

(3) the full and equal privilege to purchase or rent any item of real estate, goods, commodities, service or any other thing offered for charge to others.

\* \* \*

(d) No person, being the owner, proprietor, lessee, superintendent, agent, or employee of any place of public accommodation, resort or amusement, shall directly or indirectly or by subterfuge—

(1) withhold from or deny to any other person any of the accommodations, advantages, facilities, or privileges thereof; or

31

(2) adopt or pursue any custom, policy, practice, requirement or secret understanding, or any custom or policy of nonmembership discrimination or guest-card requirement with respect to the operation or management of such place which is intended, calculated or designed to, or which shall have the effect of discriminating against any other persons on account of race, creed, color, or national origin, or by reason of nonmembership in a club.

Criminal as well as civil penalties for violations of the provisions of Chapter 1 are contained in sections 7 and 8. Section 7(1) lays down the penalty with which we are here concerned.

Whoever, whether as owner, officer, manager, agent or employee of any business or industrial establishment, labor organization, place of public accommodation, resort or amusement, or club, violates any of the provisions of this chapter, shall, for each and every such violation, be—

(1) liable in actual damages, and in addition, thereto, to punitive damages not to exceed $5,000 to be recovered in a civil action by the person aggrieved thereby or by any resident of the Virgin Islands to whom the person aggrieved may assign his cause of action.

The owner or owners of any business where an offense mentioned herein has been committed by his or its officer, manager, agent, or employee, such owner or owners shall be severally and/or jointly liable with the offender for the actual and punitive damages provided for herein.

Each day of violation shall constitute a separate offense.

Under the provisions of section 8,

Whenever the Attorney General of the Virgin Islands has information that any person engages in any act, or adopts or pursues any custom, policy, practice, or requirement amounting in effect to violation or evasion of this chapter, he shall procure a rule to show cause to issue out of the District Court of the Virgin Islands requiring such person to show cause before such Court why his license to do business should not be revoked because of an act or acts committed against public policy.

If the Court finds that such person has violated or is violating any of the provisions of this chapter, it shall order his license re-

voked or suspended because of an act or acts committed against public policy.

§ 10. The courts shall construe this chapter liberally in furtherance of its intent as stated in section 1 of this title.

It is against that statutory background that the contentions of the defendant are cast.

■ Defendant urges that whatever the factual situation sections 7 and 8 can have no application. Its business, PRC points out, is the renting of personal property, automobiles. This business, the argument runs, is covered only by subsection 3(a), a section which does not prohibit any particular conduct. Section 3, defendant suggests, is restricted to hortatory language and does no more than declare certain rights. Subsections (b) through (g), inclusive, are the ones which regulate conduct and prohibit specified acts. On defendant's interpretation of the statute, its business does not come within the class against which the prohibitions are directed. This contention completely overlooks the broad definition of discrimination contained in section 2 which "includes refusal of sales or service, employment or setting up definite standards in any of these, or segregation based on race, creed, color or national origin". Essentially, the renting of an automobile is the sale of a service and if this is done, based on vague, inconsistent or arbitrary standards which have the effect of discriminating against persons, in this case the black native, we are confronted with the precise evil this statute was designed to remedy. Furthermore, the contention pays no regard whatsoever to the definition of "place of public accommodation, resort or amusement." That phrase specifically includes "public conveniences operated on land". I find it difficult to exclude from that definition the service offered by defendant to the public by means of the automobiles which it holds out for hire. It would be totally inconsistent with the legislative purpose to have excluded

car rental agencies when every other possible type of service publicly offered was included. The wide sweep with which the legislature defined "place of public accommodation, resort or amusement", clearly evidences its intention to be all encompassing in any and every area in which businesses deal with the public. I hold that the business conducted by defendant falls within the statutory definition of "place of public accommodation, resort or amusement". It necessarily follows, once the defendant's business is properly placed within the definition, that the proscriptions of § 3 (d) (1) fully apply to defendant.

██ Defendant further urges that the evidence failed to establish a pattern or practice of discrimination. It also argues that the acts alleged to have been discriminatory were the acts of employees of the defendant acting beyond the scope of their employment for which the corporation cannot be held accountable. These arguments were pressed separately by defendant but I deal with them together since I find short answers to them in the statute itself. As was noted above, section 7 in part reads, "the owner or owners of any business where an offense mentioned herein has been committed by his or its . . . employee . . . shall be severally and jointly liable with the offender for the actual and punitive damages provided for herein". The Legislature would have been hard put to have fashioned language which could more clearly indicate its intent to hold owner and the employee liable alike for acts of the latter. In attempting to engraft unto the statute a requirement that there must be convincing evidence of a pattern or practice before liability could attach, defendant assumes a stance totally oblivious of that portion of section 7 which makes ". . . owner, officer, manager, agent or employee [who] violates any provision of this chapter" liable for "each and every such violation" and of the further provision that "Each day of violation shall constitute a separate offense".

■ Defendant next suggests that the statutory provisions suffers from over-breath, in that the persons to be charged are defined in terms that are extraordinarily broad. Stretching the language to the bursting point, defendant foresees that even a minority stockholder of a corporation might be haled into court under the statute and fined punitive damages for the unlawful acts of the corporate employees. This interpretation requires a considerably wider construction than this court finds it possible to admit. The owner of a business as that word is used in section 7, must necessarily have reference to proprietor, that narrow group of individuals who regulate or control or have the day to day management and oversight of a business or at least are charged with such functions. I find it inconceivable that this statute by any intendment or application could reach beyond and behind the corporate structure and lay hold of the individual shareholders. Rather, the word should be accepted in its commonly understood meaning, and as thus construed, I find it to be confined within permissible range and to be sufficiently clear and definite.

As to the assertion that this statute punishes without proof of knowledge and is therefore not to be upheld, the direct answer is that the comparison to the criminal statutes and the legal principles which there govern is somewhat odious. In the context of this statute when persons deliberately discriminate in the manner forbidden by law, such persons cannot but be aware of what they are doing. I therefore fail to understand this lack of knowledge argument.

■ The remaining contention of defendant which I find it necessary to mention is its attempt to seek the protective cover of the Due Process clause of the Fifth Amendment to the Federal Constitution. The simple answer is that what defendant contends is vague and uncertain, I

35

find to be crystal clear and definite. Under the language of the statute, these plaintiffs, to sustain their burden of proving the commission of the prohibited acts, were required to show,

1. That the owner "or those acting on its behalf" offered their rental services on the open market to the public;

2. That plaintiffs were willing and able to purchase the services on the terms customarily set by the owner;

3. That their willingness to do so was plainly communicated to the owner at a time when the service in which the owner dealt was available;

4. That the owner refused to sell the services to the plaintiffs on the same terms that the owner had indicated would otherwise be satisfactory, i.e., the terms offered to other persons; and

5. That there was no apparent reason for the refusal or failure of the defendant to sell the services to plaintiffs other than the one proscribed, race or national origin. All of these things I find the plaintiffs have established by a preponderance of the evidence.

■ On the other hand, it was required of the defendant, once plaintiffs had made out a prima facie case, that it show that there were factors other than the prohibited considerations which led to its decision not to sell its services to plaintiffs. This burden cannot be met upon a mere showing that some differences did, in fact, exist between plaintiffs and other applicants. Beyond that, it should appear from the evidence that it was these other factors which were considered by defendant as the basis for its decision. There are many and varied factors to which one might look in determining whether, in the conduct of a business of the type in which this defendant was engaged, the relevant nonracial elements were utilized and relied upon in determining whether to rent to these plaintiffs as opposed to another individual. I do not take the time to de-

36

tail such factors but merely conclude that it was not the nonracial elements which prompted the actions of defendant's employees. The Butler and La Borde incidents outlined elsewhere in this memorandum occurring within hours of each other, I find to exemplify the situation where reservations, once made, were dishonored on no other basis than race or color. Nor do I see any other rational ground for the treatment Trant received when compared to the white renter who repaired to defendant's rental counter at the same time as Trant. The studied avoidance of rentals to natives decreed in writing as well as by practice, drawing remonstrative comment from the Executive Director of the airport authority, coupled with the testimony of former employees of defendant as supported by the witness LaMotta, all come together to compel the conclusion that defendant discriminated in the rental of its automobiles in clear defiance of the statute. Each of the individual plaintiffs, I conclude, is entitled to recover the statutory sum of $5,000 as punitive damages.

 Two prayers for relief asked by the plaintiffs in Civil No. 52/1970 require brief mention. First, plaintiff would have the court order that for a period of two years defendant state in all of its advertisements and prominently display in all of its places of business, the sign "NO RACIAL DISCRIMINATION". I find no warrant for this relief in the statute. Moreover, by the time these causes came to trial, defendant had thoroughly revamped its staff, and the practices which resulted in these law suits no longer obtained. To the contrary, it, at that time, affirmatively appeared that defendant, in the conduct of its business, was in no way offending Title 10 of the Virgin Islands Code. Accordingly, that relief will be denied.

Secondly, plaintiff, the Government of the Virgin Islands would have the court invoke the sanctions of that portion of section 8 which empowers this court to revoke or

37

suspend the defendant's license to do business in the territory, as an additional penalty for acts committed against public policy. The supportive finding to which that section refers would be one made at the hearing on a rule to show cause why the business license should not be revoked. In the circumstances of this case, such further hearing would, in my opinion, be duplicitous and, therefore, wasteful. Since the parties on both sides have briefed the point, I can conceive of no harm that would result from a determination that the full trial held in these causes suffices as the hearing on a rule to show cause, and I so hold. I make this holding mindful of the fact that the Government did not participate in the trial. However, since it has, by stipulation of record, adopted those proceedings, it should be bound thereby. Having found that the defendant, in the case of each of the three individual plaintiffs, committed acts against public policy in violation of the statute, all that remains for determination is whether defendant's license should be revoked or suspended, and if the latter, for what period of time. A hearing, on notice to the Government and the defendant, will be scheduled for the purpose of resolving these questions. Meanwhile, judgment may be entered in favor of the individual plaintiffs with costs and attorneys fees.